UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

ROBERT CANTU, JR., Individually and §
For Others Similarly Situated §
    PLAINTIFF §
  §
v. § CIVIL ACTION NO. 5:15-cv-0468
  §
  §
CIRCLE BAR A., INC. § COLLECTIVE ACTION
    DEFENDANT §

### DECLARATION OF Eduardo Landgrave

I **Eduardo Landgrave** declare the following to be true and correct:

1. My name is **Eduardo Landgrave**. I worked as a Sand Coordinator for Circle Bar A from 10/21/2013-10/3/14. The facts contained in this declaration are within my personal knowledge and are true and correct. As a Sand Coordinator I was paid on a salary basis in excess of $455 per week, exclusive of board, lodging or other facilities.

2. As a Sand Coordinator my primary duty was management of all activities relating to sand deliveries to the well site. I usually worked alongside another Sand Coordinator and we shared the management responsibilities. Sand Coordinators are the highest ranking Circle Bar A employees in the field. We were responsible for coaching and counseling any employee observed violating safety policies. There are usually anywhere between 5- 10 employees at the well site.

3. The management of the well site included coordinating with the Company Men, Frac Engineers, and Frac Supervisors at the site; inspecting the site to make sure there was adequate room for the equipment and trucks; making sure the trucks could safely enter the site, had adequate space to safely park while waiting to unload, making sure the trucks could safely move into position to unload the sand and that the trucks could get out safely. This responsibility included determining where the trucks would park and the path they would take, the placement of our equipment on the site and directing employees. I regularly and customarily performed these tasks and the other duties listed below.

4. I inspected the equipment to make sure it was set up correctly. I provided on-the-job training to drivers regarding the safety requirements for the job site and the client's requirements. I was responsible for making sure the job was handled efficiently and our client was satisfied with the process.

5. I received paperwork from the client specifying the job requirements, the type of sand that would be needed and the rate it would need to be provided. Sometimes I would meet with the company men before receiving the paper work to discuss the job. I went to the job site before



the job started to ensure it was set up properly and supervise the pre-fill. Because fracking jobs are complex operations, jobs rarely followed the specifications in the paperwork. Sometimes problems caused delays, meaning the company would not need the sand as quickly as expected. Sometimes things went smoother than expected and the rate of delivering the sand needed to increase. Throughout the day I would be talking to the frac engineer regarding the progress of the frac job and make decisions on how best to schedule the arrival of the trucks to meet the client's needs. I did not simply relay information but used my judgement and discretion to make decisions. I made decisions regarding how to get additional sand if the current supply was not arriving fast enough. Each time something changed, I had to use my judgment to decide how best to schedule the trucks to get the sand to arrive on time or whether and which trucks to ask to leave to avoid incurring additional costs.

6. I directed drivers where to set-up equipment according to my plan. I had the authority to assign someone to drive or handle equipment. I made sure that each driver hauling sand understood their job responsibility. I set the order of the trucks hauling the sand to ensure that the process went smoothly.

7. I frequently did a "walk around" to make sure all safety equipment was set up and the drivers were off-loading in a safe manner.

8. At the beginning of each job, I inspect the area were we will be working and prepare a Job Safety Analysis that includes the hazardous for that job. At the beginning of a shift I attended the site safety meeting. At the conclusion of the site safety meeting, either I or the other Sand Coordinator would conduct a safety meeting with the drivers, including explaining whatever site specific policies or hazards might exists and going over Circle Bar A's safety policies and those of the client. The drivers sign off on my Job Safety Analysis and I submit it as required. I enforced the safety policies of Circle Bar A. I had the authority to remove a driver who was not following safety policies or who I determined was not driving safely. I also directed the employees to correct equipment that did not meet safety standards. I gave input and made recommendations regarding the discipline and firing of drivers and it was usually followed.

9. I was responsible for the management of the operations, dealing with the company men, Frac Engineers, and client Logistics personnel during the planning, implementation and coordinating the details of the operation, ensuring a steady supply of the correct grade of sand, ensuring the equipment was properly maintained, stationing the trucks and controlling their movement, and the overall quality of our services.

10. My main job was managing the site and supervising the drivers, not physical labor. I could help out the drivers but I was not required to help them. Sometimes I helped a driver hook up a hose, but usually I did not. Hooking up a hose usually takes less than 5 minutes. The total amount of time I would spend on this activity in a 12 hour shift would be less than an hour. I did the paper work for each truck, this paper work took less than 5 minutes per truck, so the total amount of time I spent on this task was under 2 hours in a 12 hour shift. If the driver did not pay attention and caused the sand to over flow I would shovel it back into the chief however this was a rare occurrence. I considered these tasks to be incidental to my main job, managing the site and supervising the drivers. . I do not move equipment. I do not drive the trucks. Most of my time was not spent in any physical labor.

11. I witnessed other Sand Coordinators managing the site and supervising the drivers like I did.

12. I am fully aware of the lawsuit filed by Robert Cantu claiming he is owed overtime because he was not a manager or supervisor. I understand that my statements in this declaration could adversely affect my ability to join Mr. Cantu's lawsuit. I am not interested in joining the lawsuit. I am signing this declaration voluntarily and of my own free will without any threat or coercion and not under any duress. I have not been promised anything to sign this statement. I have not been given anything to sign this statement. I was given the opportunity to make changes. I am signing this statement because the statements in it are true.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed this 12 day of January 2016.

*[signature]*

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| ROBERT CANTU, JR., Individually and<br>For Others Similarly Situated<br>　　　PLAINTIFF | §<br>§<br>§<br>§ | |
| v. | §<br>§ | CIVIL ACTION NO. 5:15-cv-0468 |
| CIRCLE BAR A., INC.<br>　　　DEFENDANT | §<br>§<br>§<br>§ | COLLECTIVE ACTION |

### **DECLARATION OF Douglas Alejandro**

**I Douglas Alejandro declare the following to be true and correct:**

1. My name is Douglas Alejandro, I worked as a Sand Coordinator for Circle Bar A from 7/3/2012-11/27/2015. The facts contained in this declaration are within my personal knowledge and are true and correct. As a Sand Coordinator I was paid on a salary basis in excess of $455 per week, exclusive of board, lodging or other facilities.

2. As a Sand Coordinator my primary duty was management of all activities relating to sand deliveries to the well site. I usually worked alongside another Sand Coordinator and we shared the management responsibilities. Sand Coordinators are the highest ranking Circle Bar A employees in the field. We were responsible for coaching and counseling any employee observed violating safety policies. There are usually anywhere between 5- 10 employees at the well site.

3. The management of the well site included coordinating with the Company Men, Frac Engineers, and Frac Supervisors at the site; inspecting the site to make sure there was adequate room for the equipment and trucks; making sure the trucks could safely enter the site, had adequate space to safely park while waiting to unload, making sure the trucks could safely move into position to unload the sand and that the trucks could get out safely. This responsibility included determining where the trucks would park and the path they would take, the placement of our equipment on the site and directing employees. I regularly and customarily performed these tasks and the other duties listed below.

4. I inspected the equipment to make sure it was set up correctly. I provided on-the-job training to drivers regarding the safety requirements for the job site and the client's requirements. I was responsible for making sure the job was handled efficiently and our client was satisfied with the process.

5. I received paperwork from the client specifying the job requirements, the type of sand that would be needed and the rate it would need to be provided. Sometimes I would meet with the company men before receiving the paper work to discuss the job. I went to the job site before

1



the job started to ensure it was set up properly and supervise the pre-fill. Because fracking jobs are complex operations, jobs rarely followed the specifications in the paperwork. Sometimes problems caused delays, meaning the company would not need the sand as quickly as expected. Sometimes things went smoother than expected and the rate of delivering the sand needed to increase. Throughout the day I would be talking to the frac engineer regarding the progress of the frac job and make decisions on how best to schedule the arrival of the trucks to meet the client's needs. I did not simply relay information but used my judgement and discretion to make decisions. I made decisions regarding how to get additional sand if the current supply was not arriving fast enough. Each time something changed, I had to use my judgment to decide how best to schedule the trucks to get the sand to arrive on time or whether and which trucks to ask to leave to avoid incurring additional costs.

6. I directed drivers where to set-up equipment according to my plan. I had the authority to assign someone to drive or handle equipment. I made sure that each driver hauling sand understood their job responsibility. I set the order of the trucks hauling the sand to ensure that the process went smoothly.

7. I frequently did a "walk around" to make sure all safety equipment was set up and the drivers were off-loading in a safe manner.

8. At the beginning of each job, I inspect the area were we will be working and prepare a Job Safety Analysis that includes the hazardous for that job. At the beginning of a shift I attended the site safety meeting. At the conclusion of the site safety meeting, either I or the other Sand Coordinator would conduct a safety meeting with the drivers, including explaining whatever site specific policies or hazards might exists and going over Circle Bar A's safety policies and those of the client. The drivers sign off on my Job Safety Analysis and I submit it as required. I enforced the safety policies of Circle Bar A. I had the authority to remove a driver who was not following safety policies or who I determined was not driving safely. I also directed the employees to correct equipment that did not meet safety standards. I gave input and made recommendations regarding the discipline and firing of drivers and it was usually followed.

9. I was responsible for the management of the operations, dealing with the company men, Frac Engineers, and client Logistics personnel during the planning, implementation and coordinating the details of the operation, ensuring a steady supply of the correct grade of sand, ensuring the equipment was properly maintained, stationing the trucks and controlling their movement, and the overall quality of our services.

10. My main job was managing the site and supervising the drivers, not physical labor. I could help out the drivers but I was not required to help them. Sometimes I helped a driver hook up a hose, but usually I did not. Hooking up a hose usually takes less than 5 minutes. The total amount of time I would spend on this activity in a 12 hour shift would be less than an hour. I did the paper work for each truck, this paper work took less than 5 minutes per truck, so the total amount of time I spent on this task was under 2 hours in a 12 hour shift. If the driver did not pay attention and caused the sand to over flow I would shovel it back into the chief however this was a rare occurrence. I considered these tasks to be incidental to my main job, managing the site and supervising the drivers. . I do not move equipment. I do not drive the trucks. Most of my time was not spent in any physical labor.

11. I witnessed other Sand Coordinators managing the site and supervising the drivers like I did.

12. Beginning in March 2015, due to a lack of business, Circle Bar A did not have enough sand coordinating jobs to keep the Sand Coordinators busy. Sand Coordinators continued to be paid a salary but we had few jobs. When there was no sand coordinating work, I did whatever was needed to be done while we hoped to get more sand coordinating work. Beginning in March 2015 all Sand Coordinators, including me, kept track of the number of hours worked. We did not work more than 40 hours a week because there was not much work to do; some weeks I did not even work 40 hours a week.

12. I am fully aware of the lawsuit filed by Robert Cantu claiming he is owed overtime because he was not a manager or supervisor. I understand that my statements in this declaration could adversely affect my ability to join Mr. Cantu's lawsuit. I am not interested in joining the lawsuit. I am signing this declaration voluntarily and of my own free will without any threat or coercion and not under any duress. I have not been promised anything to sign this statement. I have not been given anything to sign this statement. I was given the opportunity to make changes. I am signing this statement because the statements in it are true.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed this 12 day of January 2016.

*[signature]*

3

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| ROBERT CANTU, JR., Individually and For Others Similarly Situated<br>PLAINTIFF<br><br>v.<br><br>CIRCLE BAR A., INC.<br>DEFENDANT | § § § § § § § § § § § | <br><br><br><br>CIVIL ACTION NO. 5:15-cv-0468<br><br><br>COLLECTIVE ACTION |

**DECLARATION OF Dana Northrup**

**I Dana Northrup declare the following to be true and correct:**

1. My name is **Dana Northrup**, I worked as a Sand Coordinator for Circle Bar A from 9/4/2012-11/27/2015. The facts contained in this declaration are within my personal knowledge and are true and correct. As a Sand Coordinator I was paid on a salary basis in excess of $455 per week, exclusive of board, lodging or other facilities.

2. As a Sand Coordinator my primary duty was management of all activities relating to sand deliveries to the well site. I usually worked alongside another Sand Coordinator and we shared the management responsibilities. Sand Coordinators are the highest ranking Circle Bar A employees in the field. We were responsible for coaching and counseling any employee observed violating safety policies. There are usually anywhere between 5- 10 employees at the well site.

3. The management of the well site included coordinating with the Company Men, Frac Engineers, and Frac Supervisors at the site; inspecting the site to make sure there was adequate room for the equipment and trucks; making sure the trucks could safely enter the site, had adequate space to safely park while waiting to unload, making sure the trucks could safely move into position to unload the sand and that the trucks could get out safely. This responsibility included determining where the trucks would park and the path they would take, the placement of our equipment on the site and directing employees. I regularly and customarily performed these tasks and the other duties listed below.

4. I inspected the equipment to make sure it was set up correctly. I provided on-the-job training to drivers regarding the safety requirements for the job site and the client's requirements. I was responsible for making sure the job was handled efficiently and our client was satisfied with the process.

5. I received paperwork from the client specifying the job requirements, the type of sand that would be needed and the rate it would need to be provided. Sometimes I would meet with the company men before receiving the paper work to discuss the job. I went to the job site before

1



the job started to ensure it was set up properly and supervise the pre-fill. Because fracking jobs are complex operations, jobs rarely followed the specifications in the paperwork. Sometimes problems caused delays, meaning the company would not need the sand as quickly as expected. Sometimes things went smoother than expected and the rate of delivering the sand needed to increase. Throughout the day I would be talking to the frac engineer regarding the progress of the frac job and make decisions on how best to schedule the arrival of the trucks to meet the client's needs. I did not simply relay information but used my judgement and discretion to make decisions. I made decisions regarding how to get additional sand if the current supply was not arriving fast enough. Each time something changed, I had to use my judgment to decide how best to schedule the trucks to get the sand to arrive on time or whether and which trucks to ask to leave to avoid incurring additional costs.

6. I directed drivers where to set-up equipment according to my plan. I had the authority to assign someone to drive or handle equipment. I made sure that each driver hauling sand understood their job responsibility. I set the order of the trucks hauling the sand to ensure that the process went smoothly.

7. I frequently did a "walk around" to make sure all safety equipment was set up and the drivers were off-loading in a safe manner.

8. At the beginning of each job, I inspect the area were we will be working and prepare a Job Safety Analysis that includes the hazardous for that job. At the beginning of a shift I attended the site safety meeting. At the conclusion of the site safety meeting, either I or the other Sand Coordinator would conduct a safety meeting with the drivers, including explaining whatever site specific policies or hazards might exists and going over Circle Bar A's safety policies and those of the client. The drivers sign off on my Job Safety Analysis and I submit it as required. I enforced the safety policies of Circle Bar A. I had the authority to remove a driver who was not following safety policies or who I determined was not driving safely. I also directed the employees to correct equipment that did not meet safety standards. I gave input and made recommendations regarding the discipline and firing of drivers and it was usually followed.

9. I was responsible for the management of the operations, dealing with the company men, Frac Engineers, and client Logistics personnel during the planning, implementation and coordinating the details of the operation, ensuring a steady supply of the correct grade of sand, ensuring the equipment was properly maintained, stationing the trucks and controlling their movement, and the overall quality of our services.

10. My main job was managing the site and supervising the drivers, not physical labor. I could help out the drivers but I was not required to help them. Sometimes I helped a driver hook up a hose, but usually I did not. Hooking up a hose usually takes less than 5 minutes. The total amount of time I would spend on this activity in a 12 hour shift would be less than an hour. I did the paper work for each truck, this paper work took less than 5 minutes per truck, so the total amount of time I spent on this task was under 2 hours in a 12 hour shift. If the driver did not pay attention and caused the sand to over flow I would shovel it back into the chief however this was a rare occurrence. I considered these tasks to be incidental to my main job, managing the site and supervising the drivers. . I do not move equipment. I do not drive the trucks. Most of my time was not spent in any physical labor.

11. I witnessed other Sand Coordinators managing the site and supervising the drivers like I did.

12. Beginning in March 2015, due to a lack of business, Circle Bar A did not have enough sand coordinating jobs to keep the Sand Coordinators busy. Sand Coordinators continued to be paid a salary but we had few jobs. When there was no sand coordinating work, I did whatever was needed to be done while we hoped to get more sand coordinating work. Beginning in March 2015 all Sand Coordinators, including me, kept track of the number of hours worked. We did not work more than 40 hours a week because there was not much work to do; some weeks I did not even work 40 hours a week.

12. I am fully aware of the lawsuit filed by Robert Cantu claiming he is owed overtime because he was not a manager or supervisor. I understand that my statements in this declaration could adversely affect my ability to join Mr. Cantu's lawsuit. I am not interested in joining the lawsuit. I am signing this declaration voluntarily and of my own free will without any threat or coercion and not under any duress. I have not been promised anything to sign this statement. I have not been given anything to sign this statement. I was given the opportunity to make changes. I am signing this statement because the statements in it are true.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed this _12_ day of January 2016.

_[signature]_

3

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| ROBERT CANTU, JR., Individually and For Others Similarly Situated<br>PLAINTIFF | §<br>§<br>§<br>§ | |
| v. | § | CIVIL ACTION NO. 5:15-cv-0468 |
| | §<br>§ | |
| CIRCLE BAR A., INC.<br>DEFENDANT | §<br>§ | COLLECTIVE ACTION |

### DECLARATION OF Ryan Pabalan

I Ryan Pabalan declare the following to be true and correct:

1. My name is Ryan Pabalan. I worked as a Sand Coordinator for Circle Bar A from 3/12/2014-11/27/2015. The facts contained in this declaration are within my personal knowledge and are true and correct. As a Sand Coordinator I was paid on a salary basis in excess of $455 per week, exclusive of board, lodging or other facilities.

2. As a Sand Coordinator my primary duty was management of all activities relating to sand deliveries to the well site. I usually worked alongside another Sand Coordinator and we shared the management responsibilities. Sand Coordinators are the highest ranking Circle Bar A employees in the field. We were responsible for coaching and counseling any employee observed violating safety policies. There are usually anywhere between 5- 10 employees at the well site.

3. The management of the well site included coordinating with the Company Men, Frac Engineers, and Frac Supervisors at the site; inspecting the site to make sure there was adequate room for the equipment and trucks; making sure the trucks could safely enter the site, had adequate space to safely park while waiting to unload, making sure the trucks could safely move into position to unload the sand and that the trucks could get out safely. This responsibility included determining where the trucks would park and the path they would take, the placement of our equipment on the site and directing employees. I regularly and customarily performed these tasks and the other duties listed below.

4. I inspected the equipment to make sure it was set up correctly. I provided on-the-job training to drivers regarding the safety requirements for the job site and the client's requirements. I was responsible for making sure the job was handled efficiently and our client was satisfied with the process.

5. I received paperwork from the client specifying the job requirements, the type of sand that would be needed and the rate it would need to be provided. Sometimes I would meet with the company men before receiving the paper work to discuss the job. I went to the job site before

1



the job started to ensure it was set up properly and supervise the pre-fill. Because fracking jobs are complex operations, jobs rarely followed the specifications in the paperwork. Sometimes problems caused delays, meaning the company would not need the sand as quickly as expected. Sometimes things went smoother than expected and the rate of delivering the sand needed to increase. Throughout the day I would be talking to the frac engineer regarding the progress of the frac job and make decisions on how best to schedule the arrival of the trucks to meet the client's needs. I did not simply relay information but used my judgement and discretion to make decisions. I made decisions regarding how to get additional sand if the current supply was not arriving fast enough. Each time something changed, I had to use my judgment to decide how best to schedule the trucks to get the sand to arrive on time or whether and which trucks to ask to leave to avoid incurring additional costs.

6. I directed drivers where to set-up equipment according to my plan. I had the authority to assign someone to drive or handle equipment. I made sure that each driver hauling sand understood their job responsibility. I set the order of the trucks hauling the sand to ensure that the process went smoothly.

7. I frequently did a "walk around" to make sure all safety equipment was set up and the drivers were off-loading in a safe manner.

8. At the beginning of each job, I inspect the area were we will be working and prepare a Job Safety Analysis that includes the hazardous for that job. At the beginning of a shift I attended the site safety meeting. At the conclusion of the site safety meeting, either I or the other Sand Coordinator would conduct a safety meeting with the drivers, including explaining whatever site specific policies or hazards might exists and going over Circle Bar A's safety policies and those of the client. The drivers sign off on my Job Safety Analysis and I submit it as required. I enforced the safety policies of Circle Bar A. I had the authority to remove a driver who was not following safety policies or who I determined was not driving safely. I also directed the employees to correct equipment that did not meet safety standards. I gave input and made recommendations regarding the discipline and firing of drivers and it was usually followed.

9. I was responsible for the management of the operations, dealing with the company men, Frac Engineers, and client Logistics personnel during the planning, implementation and coordinating the details of the operation, ensuring a steady supply of the correct grade of sand, ensuring the equipment was properly maintained, stationing the trucks and controlling their movement, and the overall quality of our services.

10. My main job was managing the site and supervising the drivers, not physical labor. I could help out the drivers but I was not required to help them. Sometimes I helped a driver hook up a hose, but usually I did not. Hooking up a hose usually takes less than 5 minutes. The total amount of time I would spend on this activity in a 12 hour shift would be less than an hour. I did the paper work for each truck, this paper work took less than 5 minutes per truck, so the total amount of time I spent on this task was under 2 hours in a 12 hour shift. If the driver did not pay attention and caused the sand to over flow I would shovel it back into the chief however this was a rare occurrence. I considered these tasks to be incidental to my main job, managing the site and supervising the drivers. . I do not move equipment. I do not drive the trucks. Most of my time was not spent in any physical labor.

11. I witnessed other Sand Coordinators managing the site and supervising the drivers like I did.

12. Beginning in March 2015, due to a lack of business, Circle Bar A did not have enough sand coordinating jobs to keep the Sand Coordinators busy. Sand Coordinators continued to be paid a salary but we had few jobs. When there was no sand coordinating work, I did whatever was needed to be done while we hoped to get more sand coordinating work. Beginning in March 2015 all Sand Coordinators, including me, kept track of the number of hours worked. We did not work more than 40 hours a week because there was not much work to do; some weeks I did not even work 40 hours a week.

12. I am fully aware of the lawsuit filed by Robert Cantu claiming he is owed overtime because he was not a manager or supervisor. I understand that my statements in this declaration could adversely affect my ability to join Mr. Cantu's lawsuit. I am not interested in joining the lawsuit. I am signing this declaration voluntarily and of my own free will without any threat or coercion and not under any duress. I have not been promised anything to sign this statement. I have not been given anything to sign this statement. I was given the opportunity to make changes. I am signing this statement because the statements in it are true.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed this ___ day of January 2016.